1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

EASTERN DISTRICT OF CALIFORNIA

11

CORTNEY DEJOHN FLEMMING,                1:12-CV-00383 AWI GSA HC

12
                            Petitioner,         FINDINGS AND RECOMMENDATION
13                                              REGARDING PETITION FOR WRIT OF
        v.                                      HABEAS CORPUS
14

15   WARDEN, Salinas Valley State Prison,

16                            Respondent.
17   _____/

18         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254.

20                                    **BACKGROUND**

21         Petitioner is currently in the custody of the California Department of Corrections and

22   Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno,

23   following his conviction by jury trial on January 11, 2009, of second degree murder (Cal. Penal

24   Code § 187(a)), and attempted murder (Cal. Penal Code §§ 187(a), 664).  (See Resp't's Answer,

25   Ex. A.)  The jury further found that Petitioner had personally and intentionally discharged a

26   firearm, proximately causing death, and that he personally and intentionally discharged a firearm

27   during commission of the attempted murder (Cal. Penal Code § 12022.53(d)). (Id.)  Petitioner

28   was sentenced to serve an indeterminate term of forty years to life plus a consecutive term of

1    twenty-seven years. (Id.)

2          Petitioner timely filed a notice of appeal.  On October 14, 2011, the California Court of

3    Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

4    decision.  (Id.)  Petitioner then filed a petition for review in the California Supreme Court.  On

5    January 11, 2012, the petition was summarily denied.  (See Lodged Doc. No. 6.)

6          On March 14, 2012, Petitioner filed the instant federal habeas petition in this Court.  The

7    petition presents the following grounds for relief: 1) The trial court committed reversible

8    constitutional error by denying Petitioner's motion to discharge a juror; 2) The trial court erred

9    by erroneously admitting into evidence photographs and a video from security cameras; and 3)

10   The prosecutor committed intentional misconduct during closing argument, and defense counsel

11   was ineffective in failing to object to the misconduct.  On July 3, 2012, Respondent filed an

12   answer to the petition.  Petitioner did not file a traverse.

13                          **STATEMENT OF FACTS**[1]

14   <u>PROSECUTION EVIDENCE</u>

15   <u>*The Initial Investigation and Fidel Jimenez's Death*</u> [n.2]

16          [n.2] The record occasionally gives the name as "Jiminez."  Because the
       information says "Jiminez," we use that spelling except where quoting.

17

18          At around 11:45 p.m. on March 23, 2008, which was Easter Sunday, Fresno
       Police Officers Garcia and Lujan were dispatched to a report of a shooting at the Liquor
       King at Herndon and Blackstone.  It was a day on which cruising was allowed, so traffic

19     on Blackstone was heavy.  The large parking lot, which served Liquor King and several
       other businesses, contained numerous cars and people.  When the officers arrived, cars

20     were leaving the lot and people were running in every direction.

21          Garcia observed a gray or silver truck that appeared to have collided with a
       building.  The truck's driver, Fidel Jimenez, was slumped over on the truck's seat.  He

22     was bleeding from the face or head and had a slight pulse.  Someone in the crowd that
       had gathered advised he had been shot.  There was broken glass on the truck's seat and

23     two tall beer cans on the floorboard.

24          Lujan began crowd control, while Garcia and Sergeant Alvarez, who was now at
       the scene, tried to extricate Jimenez.  Jimenez lost his pulse, but the officers were able to

25     get it back.  Emergency personnel then arrived and took over.  Alvarez ordered the entire
       parking lot locked down, and put out a preliminary radio broadcast containing

26

27          [1]The Fifth DCA's summary of the facts in its October 14, 2011, opinion is presumed correct. 28 U.S.C.

28   §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
     adopts the factual recitations set forth by the Fifth DCA.

information he had received concerning a white Mustang that may have been involved. The car, which contained an African-American male and possibly a Hispanic, had left at a high rate of speed.

There was what appeared to be bullet impact damage to the door frame of a business just south of the one into which the pickup had crashed.  There was a bullet entry hole on the passenger side pillar of the pickup, and a deformed bullet fragment was found in the corresponding wall panel.  Although a number of latent prints were lifted from vehicles, cans, bottles, and other trash in the parking lot, none could be identified as belonging to Lopez or Flemming. No firearms were found in the pickup nor was an antitheft device called the Club.  However, an open flip-style cell phone was found on the passenger side floorboard of the vehicle.

The entire strip mall/parking lot area was searched for evidence.  No Club security devices, bars, or anything else that might be used as a weapon were located.  No shell casings were found.

Fidel Jimenez suffered a gunshot wound to the head, behind the right ear, with injuries to the left back of the brain and the cervical spine.  He was alive but paralyzed from the neck down when brought to the hospital, and he remained that way until April 1, 2008.  On April 1, his neurological status began to change, and it was determined he had developed an aneurysm in the area of several bullet fragments.  A corrective procedure was unsuccessful, and Jimenez's family made the decision to withdraw life support.  He died on April 4.  The cause of death was related to injuries to the brain and spinal cord, with those injuries having been caused by the gunshot wound to the head that he sustained on March 23.  The wound course was inconsistent with him looking at the shooter at the time the bullet struck him, but was consistent with him looking straight ahead.

*Witness Accounts* [n.3]

[n.3] In Akira Kurosawa's film Rashomon, four individuals witness a crime. Each then recounts the story honestly, but in mutually contradictory ways. Because of the Rashomon-like testimony of the various eyewitnesses – even those who were not acquainted with the victims or defendants – we summarize each individually, rather than attempting to compile a unified account. We also include their statements to police.

*Adam Mirelez*

On the evening of March 23, 2008, Adam Mirelez and Jimenez, his longtime friend, went cruising on Blackstone.  Jimenez was driving his 1986 primer-gray Silverado pickup.  Mirelez was sipping from a can of beer.  He never saw Jimenez drinking that night, although there was a second beer can in the truck.

Blackstone was fairly crowded, and at some point they pulled into the parking lot on the southwest corner of Herndon and Blackstone, where the Liquor King was located.  There was a speed bump as they first came in, and a crowd of people and cars.  Mirelez estimated they were going five miles per hour or less.  Jimenez was on his cell phone.

The car stopped by a median before it reached the crowd of people.  Jimenez and Mirelez were trying to get through, but there were people everywhere.  As they waited for people to move, Mirelez saw Lopez on the sidewalk on the driver's side of the truck, almost 10 feet away.  Lopez came up to Jimenez's window, which was open, and angrily yelled a couple of times, "What's up, homey?"  Jimenez nodded his head at Lopez as if to

3

say, "What's up," but he was not really paying attention because he was on the phone.

Lopez then came to Mirelez's side and said the same thing numerous times. Mirelez, who had a can of beer in his hand, put the beer in his lap and pulled the door handle, but the door did not open any distance.  Lopez then punched him in the nose through the window, causing Mirelez's nose to bleed profusely.  Mirelez leaned down toward Jimenez and grabbed the beer can, which was between his legs.  He then raised back up.  He never attempted to strike Lopez; as far as he knew, there was nothing in the truck he could have used to do so.  Jimenez did not have a Club.

Lopez stepped back and yelled at his friend, "Pull the pistol. Pull the pistol."  The friend, a tall African-American who was wearing a white sweater and possibly a hood, seemed to come out of nowhere.  He pulled a gun from his pocket or belt area and pointed it at Mirelez from a little over six feet away.  Mirelez ducked down, heard a shot, and then felt the truck go forward.  It hit something, then went over the curb and into a store. He heard two shots together.  Because he had ducked down, he did not see what happened to Lopez or the African-American male after the shooting.  Mirelez believed that if he had not ducked down, he possibly would have been shot.  The bullet came through the window where he had been sitting.  He had been sitting between the gun and Jimenez.

Once the truck hit the building, Mirelez got out and looked at Jimenez.  Mirelez did not see any blood, but he could not get Jimenez to wake up. Mirelez then ran.  He had just been shot at; there were people everywhere and he did not know if his assailants were still around or what was going on. He returned within a minute, and the police soon arrived.

When subsequently interviewed by Detective Byrd, Mirelez described the shooter as wearing a fitted baseball cap and a white, zip-up, hooded sweater. Shown a photographic lineup, Mirelez selected Lopez's picture and said it looked most like the person who hit him and said to pull out the pistol. Byrd also showed Mirelez a photographic array containing Flemming's picture, but Mirelez could not identify anyone. Mirelez did not recognize Flemming at trial. When shown a surveillance camera photograph, however, he found the individual's white sweater, and the way he stood and had his hands in his pocket, familiar. Mirelez believed he had previously seen the white sweater on the shooter.

*Martin Alvarez*

On March 23, 2008, Martin Alvarez was cruising on Blackstone with his friend, Gabriel Lopez, in Gabriel's truck.[n.4] Seeing a lot of cars in the parking lot at Blackstone and Herndon, they decided to stop. They had parked and gotten out of their vehicle, when Alvarez saw an older gray truck drive in. It was proceeding slowly at five miles per hour or less.

[n.4] To avoid confusion with Defendant Lopez, we refer to Gabriel Lopez by his first name. No disrespect is intended.

Lopez – whom Alvarez had seen on a prior occasion – was walking across the parking lot, and the truck stopped to let him cross. In Alvarez's opinion, the truck did not stop "in any aggressive way." Lopez, who was about the width of one parking space away and still on the sidewalk, nevertheless threw up his arms, approached the truck, and loudly asked, "What's up dog?" He also said, "Do you have a problem?" and things of that sort. His comments were directed at the driver.

4

Lopez kept saying the same stuff over and over, and the male in the passenger seat of the truck started to open the door. The passenger said something like he was not going to let somebody start arguing over something stupid. By that time, Lopez had already gone around the truck and was asking if the passenger was going to do something. Lopez then pushed the door closed. The passenger window was open; Alvarez saw Lopez swing at the passenger, but could not see whether contact was made. The passenger reached toward the seat as if to grab something with which to hit Lopez back, although Alvarez never saw anything in his hand. Lopez then called his friend, shouting, "Hey, dog. Pull that gun out. Pull that gun out." Alvarez was not sure where Lopez's friend came from, but when Lopez shouted, the friend, who was African-American, ran toward the truck. Alvarez saw him kind of reach and hold his belt area as he moved toward the truck's passenger, shouting, "What's up dog?"

Gabriel told Alvarez to get in the truck, and the two tried to watch what was going on while also going toward their vehicle. Lopez's friend was arguing and at the same time pointing the gun, which was small and black. Alvarez saw the truck's driver step on the gas, and Lopez's friend shot toward the truck. Two shots were fired. The first hit the pillar of the truck. The second hit the driver. His foot apparently got stuck on the gas, and the truck hit an SUV and then the building.

Although Alvarez did not see what Lopez did after the shots were fired, he saw the shooter jump into the back seat of an older, two-door white car. The shooter was wearing a white sweatshirt with green lines on it and maybe some jeans. He was not wearing a hat. Alvarez did not see where the car went.

Detective Tacadena interviewed Alvarez within hours of the shooting. Alvarez reported that he saw the Hispanic male and the African-American male getting into a white, older-model car he thought was a Monte Carlo. Alvarez also related that prior to the shooting, he saw the pickup's passenger reach across his body with his hand and swing at the suspect standing outside the vehicle with an object that appeared red in color. At some point, the passenger had a beer in his hand. Alvarez reported hearing the passenger say, "F*** this. I ain't gonna, I ain't gonna take this from this guy[.]" Alvarez said the African-American was wearing a white sweatshirt with a green shirt underneath. When shown a photographic lineup containing Lopez's picture, Alvarez identified Lopez and said he was 100 percent sure he was the person who punched the passenger and said to pull out the pistol.

_Gabriel Lopez_

Gabriel also saw the pickup traveling in the parking lot. He did not believe it was going that fast, because it stopped and waited for him to back into a parking stall. He saw the truck stop at a second point and heard arguments. They seemed to come from the front and side of the truck.

Gabriel saw an African-American male with a white shirt in front of the truck. This man raised his hands. The next thing Gabriel saw was a person with a black shirt reaching into the truck like he was trying to punch the passenger. He heard the person in the white shirt say something like, "Get it out." The person with the black shirt then took a few steps away from the truck and started shooting. The truck, which had accelerated just prior to the shots being fired, turned to the left and hit other cars.

The two individuals involved in the altercation started walking slowly toward where Gabriel's truck was parked. A mid-1980's Monte Carlo SS and a black-and-white Mustang were in that direction. The pair appeared to be walking toward the Monte Carlo, but Gabriel did not see what car they entered.

Detective Byrd interviewed Gabriel a few hours after the shooting. Gabriel said the African-American was possibly wearing a white shirt. Gabriel related that he heard glass break and then shots. He saw the African-American male's hand extend prior to the shooting, but did not see the gun. Gabriel later recontacted Byrd to relate that he had seen the Mustang driving up and down Blackstone, with a passenger who was an African-American male with cornrows and a white shirt.

*Terry Reyes*

Terry Reyes was in the Liquor King parking lot a bit after 10:00 p.m. on Easter Sunday, 2008. She saw an older-model, primered truck pull in. It was barely moving because the place was so packed with cars, and then it stopped. Reyes then saw two men run around the front of the truck to the passenger side. She could hear arguing, and saw the Hispanic male start to hit the passenger of the truck through the window. The passenger ducked down or blocked himself from getting hit. Reyes thought she saw a little piece of something, possibly a stick, that he was using to deflect the blows, but he could have been using his arms. She never saw anything come out of the truck, and did not believe the people outside the truck were in danger.

Reyes saw the other man, an African-American, pull a gun from the belt area of his jeans and point it at the truck. It looked like he tried to pull the trigger and nothing happened, but then he pulled again and Reyes saw two shots and heard gunshots. The gun was shot directly at the truck from the passenger side. The African-American and Hispanic males then ran off and the truck crashed into a building. The suspects ran to what Reyes believed was an older white car that could have been a Mustang.

Reyes told Officer Taliaferro at the scene that the shooter, an African-American male, had stepped out of a Ford Mustang and shot into the victim's vehicle. When interviewed by Tacadena, she said the African-American's hairstyle was a short fade, and he was wearing a white T-shirt and light blue jeans. She also said both suspects left the scene in an older-model white Mustang.

*Jose Vargas*

Jose Vargas saw Jimenez's truck pull into the parking lot. He estimated it was travelling five miles per hour or possibly slower, "like a walking pace." Vargas heard an argument between an African-American male and the passenger in the truck, but no reference to a firearm. The African-American male approached the passenger side of the pickup and punched the passenger. The passenger swung backward, moving his hand at an arc up by his ear. There was nothing in his hand. The African- American male then stepped back, pulled a gun from his front pocket or belt, and shot what Vargas believed to be three rounds into the vehicle. The shooter was wearing a white sweatshirt or sweatshirt jacket and dark jeans or black pants. He did not have anything on his head. He was the only person Vargas saw who appeared to be associated with this event.

Fresno Police Officer Rose took a statement from Vargas at the scene. In part, Vargas reported that he saw an African-American male approach the passenger side of the truck, and that at some point he heard a voice yell, "Pull out the piece[.]"

*Juan Padilla*

Juan Padilla, who was with Vargas, also saw Jimenez's truck pull into the parking lot. It was going slow, perhaps five miles per hour. He subsequently heard some arguing, then saw a punch thrown on the passenger side of the truck. Because he was not wearing his glasses, he could not see well enough to see who threw the punch. It appeared that the

passenger either swung back or attempted to block a blow, whereupon an African-American individual outside the truck took a step back and made a motion like he was reaching for a weapon.[n.5] Padilla turned around and told his friends to duck. He then heard two or three gunshots. The African-American male ran.

> [n.5] Padilla did not see anything in the passenger's hand. He believed he would have noticed if there was something large, but probably would not have seen anything small.

Byrd interviewed Padilla a few days after the shooting. Padilla said he saw the African-American male go up to the passenger side of the truck and strike the passenger. He said the African-American male was wearing a white jacket or sweater.

### *Yvette Uribe*

Yvette Uribe grew up with Flemming and was also acquainted with Lopez. She saw them at Liquor King on Easter Sunday of 2008, although she did not know at what time. She estimated it was an hour or so before the shooting.

### *Janell Mayberry*

Janell "Nellie" Mayberry was acquainted with both Flemming and Lopez, whom he knew as Chano.[n.6] On Easter Sunday, 2008, Mayberry drove his green four-door Infiniti to Flemming's house so they could go cruising. With Mayberry was Albert "Papa" Hood. Eventually, Mayberry drove to the Liquor King, accompanied by Hood, Flemming, and Flemming's girlfriend, Claudia. Mayberry was following a white Monte Carlo that contained Kevin Tatum (an African-American), Lopez, and Luis Perez. On the way, they stopped at several stores. At no time that evening did Mayberry hear Lopez ask if they wanted to take a gun with them.

> [n.6] Mayberry's testimony might best be described as evolving over the course of his time on the witness stand. We have attempted to synthesize the versions into one that imparts the most information.

At some point while Mayberry was in the Liquor King parking lot, he heard, but did not see, a shooting. He ran back to his car, arriving about the same time as Flemming, Claudia, and Hood. Everyone was talking about the shooting, although nobody was talking as if they had seen it. Mayberry immediately left the parking lot. He did not know who did the shooting or if Flemming had a gun. He did not see who got into Tatum's car.

At some point after the shooting, Lopez called Mayberry, wanting his gun back. Mayberry and Hood drove to Lopez's house about an hour after the shooting. Lopez grabbed the gun from Mayberry's car, but Mayberry could not remember where in the car. This was the first time Mayberry saw the gun.

Mayberry and Hood remained at Lopez's house for about an hour. At some point, Flemming called Mayberry. Flemming may have mentioned cameras at the Liquor King, as they were all wondering whether the store had cameras.

Byrd and Tacadena interviewed Mayberry two weeks after the investigation started. They tape-recorded the interview, which took place at Mayberry's home. By the time of the interview, Byrd had spoken to about 30 people, and so already knew what he should be hearing from Mayberry.[n.7]

[n.7] At trial, Mayberry testified that he could not remember what he told Byrd, but believed he "[h]alfway" told him the truth.

Mayberry initially was very evasive and inconsistent. Ultimately, however, he talked about a person named Chano, and identified a photograph of Lopez. He said there was a plan to go cruising on Easter, and that he had gone to Lopez's house early that evening to go cruising. Originally, he was in Kevin Tatum's white Monte Carlo SS, but eventually he left in his own green Infinity. While at Lopez's house, Lopez asked the group if they wanted him to bring his gun. Flemming told him to bring it. Lopez then brought it out of his house and took it with them when they went cruising.

Mayberry related that they went to the Liquor King parking lot, then left to go to another liquor store and returned. With Mayberry in the car he was driving were Albert Hood in the passenger seat, and Flemming and Flemming's girlfriend, Claudia Seamster, in the back seat. Kevin Tatum's white Monte Carlo SS was traveling with them; in that car were Tatum, Lopez, and Luis Perez.

Mayberry told Byrd that he heard a shooting, whereupon he ran back to his vehicle. At the vehicle when he arrived were Hood, Flemming, and Seamster. As they were leaving the scene, Flemming and Hood both said, " 'That n***** got busted on.' " Flemming also said, "I told him to stop f***ing around." Seamster was upset and crying, and Flemming was trying to calm her down. Mayberry related that from the scene, he went south on Blackstone. He dropped Flemming and Seamster off at an apartment complex, then had a conversation with Hood about "laying down" after something like this, meaning they should not be out and about. Lopez subsequently called, requesting his gun, so Mayberry drove to Lopez's house. There, Hood retrieved the gun—a .38 Special—from the back seat area where Flemming had been and gave it to Lopez. Upon receiving the gun, Lopez said something to the effect of, "Thanks, fool. I need it," and then took it into the house. Flemming called Mayberry while Mayberry was at Lopez's house. Flemming asked if he thought there were videos at the Liquor King. Mayberry then passed the phone to Lopez, and Flemming spoke with Lopez.

*Luis Perez*

Luis Perez had been friends with defendants since childhood. He "[s]omewhat" recalled Easter Sunday of 2008, as he was "kind of drunk" that day. Around 9:00 or 10:00 that night, Perez and Kevin Tatum drove over to Lopez's house in Tatum's white Monte Carlo to pick Lopez up to go cruising. Perez did not see Flemming there.

The trio drove up and down Blackstone. Perez believed he saw Flemming on Blackstone late that night, but did not really remember because he was drunk. Perez's group stopped at the Liquor King parking lot, then went somewhere else to get more liquor, then returned to the Liquor King lot. They probably cruised Blackstone for an hour or two before going to the Liquor King parking lot for the final time.

While Perez was standing outside one of the stores, he heard gunshots. He did not see what happened. He ran to the car; Lopez and Tatum were already there. They got into the car and joined a line of vehicles trying to leave. Tatum was driving. It took them three or four minutes to get out of the line, then Tatum dropped Perez and Lopez off at Lopez's house and left. Perez did not recall any conversation in the car about what had taken place.

Byrd interviewed Perez on April 4, 2008, and tape-recorded their conversation.[n.8] Perez said he had consumed some hard liquor before going out

8

cruising on Blackstone, and also drank a little once out there. Perez related that on the date of the shooting, he was with Kevin Tatum and Lopez. He went to Lopez's house, but did not see Flemming there. He thought he might have seen him driving on Blackstone in a green four-door sedan with tinted windows.[n.9] Eventually, he admitted seeing Flemming in the Liquor King.

[n.8] According to Perez, he had consumed 9 or 10 beers prior to the interview.

[n.9] The windows of Mayberry's car were tinted.

Perez told Byrd that at some point, he heard gunshots at the Liquor King. When he got to the car, Tatum and Lopez were there. Perez eventually related that Lopez said he had almost gotten run over, he was in a fight with the passenger of a truck, and one of his friends shot. Lopez never said which one.

Perez said that after the shooting, they went to Lopez's house, where Perez stayed until he was picked up by somebody else. The white Monte Carlo left. Perez first said Tatum did not want to give him a ride home because the tags on the car were not current. Eventually, he agreed with Byrd that the real reason Tatum did not want to give him a ride home was because they knew the vehicle had been seen at the location of the shooting and that involved parties had gotten into it, and he did not want to be driving it around.

Perez related that a green car showed up at Lopez's house. It looked like the same car Flemming had been in. The car was present at the Liquor King. When it arrived at Lopez's house, its occupants gave Lopez a gun.

Perez said he himself was wearing a red hat and red shirt that night. Lopez was wearing a black jacket, and Flemming was wearing a white sweater with a black shirt underneath. Perez said Tatum might have been wearing a white jersey, then later mentioned a team jersey.[n.10]

[n.10] The final descriptions Perez gave Byrd were consistent with what Byrd saw on a surveillance videotape taken inside the Liquor King.

*Kevin Tatum*

Kevin Tatum had known Flemming since high school. He first met Lopez on Easter night, 2008, when he went cruising with Lopez and Luis Perez, each of whom he picked up in his white 1987 Monte Carlo SS. While picking Lopez up at Lopez's house, there was no mention of a handgun. Tatum did not remember if he saw Flemming at Lopez's house. At some point, he saw a green car owned by Janell Mayberry, but he did not remember when.

The trio went cruising down Blackstone somewhere in the timeframe of 8:00 or 9:00 p.m. They ended up in the Liquor King parking lot, then left to go to another liquor store down the block. At some point, they returned to the Liquor King parking lot. When the shooting occurred, Tatum was in a different area of the parking lot. Mayberry's car was next to his.

Tatum did not see the shooting, but heard the shots. People then scattered. Tatum ran to his car. When he left the parking lot, Perez and Lopez were with him. The green car left at the same time. It contained Mayberry, Hood, Flemming, and Claudia. Tatum did not remember anybody in his car being excited or what Lopez might have been saying.

Tatum dropped Lopez off at home. He believed he also dropped Perez off, then went home himself. He made no comment, and was not concerned, about anybody possibly looking for his car, which he accidentally wrecked soon after the shooting.

On April 15, Byrd interviewed Tatum, who admitted being in the Liquor King on Easter. Byrd showed Tatum some digital photographs that were created from the video surveillance system inside the store. Tatum identified himself on one of the photographs. He recognized himself by his clothing, mainly his blue hat. Tatum was able to say who else was in the photograph, and that those people were in the store at the time he was. Tatum identified Flemming in one of the photographs and mentioned he was wearing a white jacket. He was also able to identify Perez, who was wearing a red hat and red shirt, and Lopez.

*Claudia Seamster* [n.11]

[n.11] Seamster and Flemming married in January 2009. Although she used Flemming as her last name at the time of trial, we refer to her as Seamster for clarity.

On Easter Sunday, 2008, Flemming was at Claudia Seamster's house for most of the day. At some point around nightfall, Mayberry picked up the couple. Hood was in the car with him. They went riding around. Seamster believed they went to a liquor store, although Flemming was not drinking at all that day. No other car was with them. Seamster was unacquainted with Lopez, except for seeing him in court. Although she saw a lot of people on Easter Sunday night, she did not see him or go to his house. She did not see a handgun or see him provide a handgun to Flemming.

At some point, there was a shooting at their location. Seamster had gotten out of the car to go to the restroom when she heard loud noises, then everybody panicked. There were people and cars everywhere, and at first she could not find Mayberry's vehicle. When she finally located it, it was not in the same place it had been. Mayberry, Flemming, and Hood were already inside. One of them said they heard gunshots. They were scared. No one said who had done the shooting, and she did not see a gun.

Byrd obtained information that Seamster might be an important person in the case three or four days after the shooting. He made numerous unsuccessful attempts to contact her over the course of three or four months. In October 2008, he saw her in the audience at one of the hearings in this case, and asked her to accompany him to the police department so he could obtain a statement. She agreed to do so. She was not under arrest, and he interviewed her in his office rather than in an interview room.[n.12]

[n.12] A recording of the interview was played for the jury.

In the interview, Seamster related that she had never met Lopez before the night of the shooting. He was a friend of Flemming, Mayberry, and Hood. They were driving around, went somewhere, and Lopez was there.

Seamster admitted seeing the gun at one of the stops she, Mayberry, Flemming, and Hood had made. Lopez had it. She did not see it in Flemming's possession or in the car. She eventually admitted the people with her in the car were saying that they were arguing or something and the guy in the truck reached for something. When Byrd asked whether Flemming told Seamster that he shot the victim, Seamster responded that he said it was because they were arguing and he reached for something and Flemming got scared, she guessed. It was being said that he thought the guy was going to get a weapon or something. Seamster believed Flemming was the one saying this, but she did not know.

10

Seamster did not know if Flemming shot the victim. If he did, it would be out of character for him and would be because somebody provoked him or he felt he was in danger.

*Additional Evidence*

On April 3, 2008, Lopez was taken into custody and a search warrant was executed at his residence. A Rossi .38 Special revolver containing two expended cartridges and no live rounds was found on the floor of his bedroom closet, wrapped in a black Tshirt.[n.13] A black knit cap containing live ammunition was found on a dresser in the same room. The gun and expended cartridges were subsequently processed for fingerprints. None were located. The gun's grip and trigger were swabbed for DNA, and DNA samples were obtained from defendants. Although a DNA profile consistent with a single individual was obtained from the trigger, Flemming was eliminated as the source. A mixture of DNA from at least three individuals, one of whom was female, was obtained from the grip; again, Flemming was eliminated as a source.[n.14] Lopez, however, could not be excluded as a contributor to the DNA obtained from either location. The DNA profile obtained from the trigger was indistinguishable from the profile obtained from Lopez's reference sample, making it very likely Lopez was the source of that DNA. It could not be determined how long the DNA had been there. It could not be determined if the bullet fragment found in Jimenez's truck was fired by this gun, but neither could the gun be eliminated.

[n.13] Because the gun was a revolver, it did not eject shell casings when fired. Shown this gun at trial, Alvarez testified it was consistent with the one used to shoot Jimenez, although he could not say it was the same gun. Shown a photograph of this gun by Byrd, Mayberry said it looked like the one he had seen on the night of the shooting.

[n.14] According to Scott D. Lewis, senior criminalist for the State of California, if someone used a handgun and then wiped it down to remove fingerprints, the handgun was left in a car and then picked up by a second individual and handed to a [f]ifth individual, and the handgun was then stored in a cloth covered in bodily excretions, the chances of detecting the original handler of the gun would be almost zero. If the gun were wrapped in something that had semen and vaginal fluid on it, this could account for finding a profile with at least three contributors including a female.

On April 4, 2008, Byrd interviewed Flemming, who was in custody. Flemming related that he was at his mother's house all day on Easter, and that he did not leave until about midnight. When he left, he was with his friend Nellie, whose last name he did not know. They were in Nellie's vehicle, a light blue Ford Explorer, and they went driving around on the west side. Flemming first denied knowing the Liquor King's location, but later said he had probably gone there, but was not sure because he had been drinking and passed out at one point. Flemming denied being at the Liquor King parking lot at approximately 11:45 p.m. on Easter or shooting anyone that night. He admitted knowing Lopez, but denied seeing him that day and said he had not seen him in about four months.

Byrd and Tacadena showed a photographic lineup containing Flemming's picture to several people. No one identified him.

DEFENSE EVIDENCE

*Lopez*

Crystal Torres was not a friend of either defendant. On March 23, 2008, she was

11

not drinking. She heard an argument and saw an African-American male in a white Tshirt, arguing with a person in the victim's truck. The man in the white shirt was in front of the truck. He came around from the driver's side to the passenger side. Another male, a Hispanic who was wearing a sweater, seemed to be with him and came from the same spot as the African-American. The African-American male swung at the passenger in the truck, but Torres did not know if the blow connected. The passenger flinched back, and the driver yelled something. The passenger reached down and pulled out a red Club, which he swung halfway out the window. The African-American male moved back, and the passenger put the Club back in the truck. Someone yelled, "Pull it out." The African-American male stepped back and pulled out a gun. He fired, and the driver pulled the passenger down. The truck reversed and tried to get out, but there were too many cars, and the African-American male fired again. The truck then went forward and hit another truck and then struck a building.

_Flemming_

Christopher DeLecce was cruising on the night of Easter Sunday, 2008. At about 10:00 p.m., he arrived in the area of Blackstone and Bullard to Herndon. Because his car was overheating, DeLecce pulled over by the Mexican restaurant in the same parking lot as the liquor store. There was a party atmosphere in the area, with numerous cars and people.

At some point, DeLecce heard a couple pops. He first thought it was firecrackers, but then saw a 1972 to 1974 white Chevrolet pickup "peeling out." It hit two parked cars and went into a building. DeLecce saw a person standing next to where the pickup would have been right before it peeled out. He had his arm extended and was shooting at the back of the pickup. The person, an African-American male, had cornrows, a white T-shirt, and blue jeans. DeLecce could not tell if he was with anyone. The gun was small and chrome, and DeLecce believed about five shots were fired.

Nestor Cerna was cruising on Easter Sunday, 2008, and was in the parking lot at about 10:30 or 10:45 p.m., when he heard gunshots. Before the shots were fired, Cerna's attention was drawn to a 1969 or 1970 white Oldsmobile 442. An African-American male was associated with that car. He was wearing a white shirt and had beaded cornrows.[n.15] Cerna had seen him earlier in the evening when cruising on Kings Canyon; the person's partner, who was also African-American, was right behind him in a car that was the same year and body style. When the shooting happened, the vehicle was in the area of the shots, but no one was inside. The African-American male was around the crowd that was near the shooting. Seconds before the shooting, Cerna saw a white, lowered, older Chevrolet pickup that later crashed into a building, doing a burnout in the parking lot.[n.16] As this truck was pulling away, Cerna saw the smoke from its tires. He then heard shots and the truck crashed. The passenger jumped out and ran down the sidewalk by the Liquor King. He was not carrying anything and was waving his arms.

[n.15] When interviewed by detectives, Cerna said this individual was possibly wearing a yellow shirt.

[n.16] Crystal Torres observed a white pickup smoking its tires. She was acquainted with the passenger. This was not the same truck as the victim's truck. It was the only vehicle she saw smoking its tires in the 25 to 30 minutes she was in the parking lot.

(See Resp't's Answer, Ex. A.)

1

**DISCUSSION**

2    I.    Jurisdiction

3         Relief by way of a petition for writ of habeas corpus extends to a person in custody

4    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6    529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

7    guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County

8    Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

9    U.S.C. § 2241(d).

10         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

13   Cir. 1997), cert. denied, 522 U.S. 1008 (1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769

14   (5th Cir.1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v.

15   Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's

16   enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

17   governed by its provisions.

18   II.    Standard of Review

19         Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

20   barred unless a petitioner can show that the state court's adjudication of his claim:

21        (1) resulted in a decision that was contrary to, or involved an unreasonable
          application of, clearly established Federal law, as determined by the Supreme
22        Court of the United States; or

23        (2) resulted in a decision that was based on an unreasonable determination of the
          facts in light of the evidence presented in the State court proceeding.
24
     28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624
25
     (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.
26
          As a threshold matter, this Court must "first decide what constitutes 'clearly established
27
     Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,
28

1  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

2  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

3  of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

4  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

5  set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

6  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

7  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

8  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

9  review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

10 Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

11 Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

12 end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

13 at 126; Moses, 555 F.3d at 760.

14      If the Court determines there is governing clearly established Federal law, the Court must

15 then consider whether the state court's decision was "contrary to, or involved an unreasonable

16 application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28

17 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

18 the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

19 question of law or if the state court decides a case differently than [the] Court has on a set of

20 materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

21 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

22 character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third

23 New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

24 [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

25 governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

26 clearly established Supreme Court precedent, the state decision is reviewed under the pre-

27 AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

28      "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

14

the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

15

II.    Review of Claims

     A.  Failure to Dismiss Juror

     Petitioner first alleges the trial court erred in violation of his constitutional rights by failing to discharge Juror #3 in light of the juror's purported bias and misconduct.

     This claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA denied the claim in a reasoned decision.  (See Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the California Supreme Court in a petition for review.  The California Supreme Court denied the claim without comment or citation of authority.  (See Lodged Doc. No. 6.)  When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the claim as follows:

JUROR MISCONDUCT

     Defendants contend the trial court committed reversible error by refusing to discharge Juror No. 3 in light of the juror's purported bias and misconduct. We conclude the court did not err.[n.21]

     [n.21] We reject the Attorney General's argument that defendant's claim was forfeited by their failure to renew the motion to discharge Juror No. 3 after the trial court denied it without prejudice. Although, as a general proposition, a matter is not preserved for appellate review when a trial court denies a motion without prejudice and the motion is not renewed (People v. Mitts (2010) 48 Cal.4th 158, 170), here, as will be apparent, the trial court's comments made clear that the motion was denied unless something further arose. Since nothing did, it would have been futile for defendants to renew the motion at trial, and in any event, they renewed their challenge to Juror No. 3 in their motion for a new trial. (See, e.g., People v. Carasi (2008) 44 Cal.4th 1263, 1296; People v. Bell (2007) 40 Cal.4th 582, 595.)  Accordingly, they did all that was necessary to preserve the issue for our review.

A. Background

     July selection began on August 6, 2009.[n.22] Juror No. 3 was in the panel of prospective jurors sent to the courtroom on this date.[n.23] Because the only inquiry undertaken at the time was to be with respect to hardship, the prosecutor, with the court's approval, did not display his witness list. It is unclear whether Detective Byrd was seated at counsel table; if so, he was not introduced to the prospective jurors. Prospective jurors not excused for hardship were ordered to return on August 11.

     [n.22] All dates in this section are to dates in 2009 unless otherwise stated.

     [n.23] We are able to determine this by matching names on the confidential juror

case information sheet dated August 6, 2009, to unredacted juror information that was initially contained in the record on appeal. The record on appeal sometimes refers to Juror No. 3 as "****20" and "****51." To avoid confusion, we will consistently refer to the juror as Juror No. 3.

On August 11, Juror No. 3 was seated in the box. At some point, the parties' witness lists were displayed, and the court asked whether any of the prospective jurors in the box knew, were acquainted with, or had heard about, any of the potential witnesses. No one responded. Byrd was not present at this time.[n.24] At the conclusion of its voir dire, the court asked if there were any reasons not mentioned that would cause any prospective juror to doubt that he or she could be completely fair and impartial to both sides. There was no response.

[n.24] It appears Byrd was on vacation from approximately August 10-14.

On the afternoon of August 12, the jury was empanelled and sworn. Among its preliminary instructions, the court admonished the jurors not to talk about the case with anyone; not to speak to any of the defendants, witnesses, or lawyers involved in the trial; and, if they received information about the case from a source outside the trial, even unintentionally, to not share the information with other jurors, but to let the court or bailiff know.

On the morning of August 19, the prosecutor informed the court that Byrd reported having contact with someone he knew from a sister church, and that the person was one of the trial jurors. The court inquired of Byrd, who related: "His name is [redacted]. We don't know each other's names. We have one church and he goes to a sister church. At men's retreats any time there's a function where the churches get together, I mean, that's how I know him just from that and he recognized me right away. Again, we don't know each other's names. And he came [and] gave me a hug. Bless you. That type of thing. [¶] And I saw he had a juror tag and I said, Are you on a jury? And I said, What department? And he said, 72." The court decided to address the matter at a more convenient time.

When the court excused the jury for lunch the next day, it asked Juror No. 3 to remain. This ensued:

"[THE COURT:] And Juror Number Three, I understand that you are familiar with Detective Byrd?

"JUROR SEAT NUMBER THREE: Slightly.

"THE COURT: And Detective Byrd had said … that you belong to different branches of, is it the same church?

"JUROR SEAT NUMBER THREE: Yes.

"THE COURT: And that you have either seen him or talked to him or something along that line at a retreat?

"JUROR SEAT NUMBER THREE: Right. But that's as far as it goes.

"THE COURT: All right. And then apparently Detective Byrd is very diligent. He told us that you perhaps saw each other in the hallway [and] said, Hello. Hug. Said something like, Bless you, brother, and went on. He found out that you were a juror and ended the information [sic].

"JUROR SEAT NUMBER THREE: That was after the Bless you, brother. We were coming up the hallway, or actually the elevator, saw each other, said, Hello. What have you. Saw my badge. Said I was in Department 72. He said that's the case he's working. And I said, By the way, I know your name is Richard. What's your last name? And he said, Byrd. That's it.

"THE COURT: No. There's no fault here. We have to ask these questions. No, you shouldn't take offense at the questions or anything….

"JUROR SEAT NUMBER THREE: Well, I don't want anything taken out of context.

"THE COURT: No. There's not going to be anything taken out of context.

"All right…. Do you feel that there's anything about your relationship with Detective Byrd, who would be the chief investigating officer for the prosecution, do you think there's anything about your relationship … that would get in the way of you being fair to both sides?

"JUROR SEAT NUMBER THREE: None.

"THE COURT: All right…. [S]ometimes the chief investigating officer doesn't testify and sometimes they testify to very important things and I don't know what's going on [sic] happen here.

"JUROR SEAT NUMBER THREE: If I may intervene. At that moment when you were, I remember you saying that, you know, before jury selection. Well, see, at that time I didn't even know who he was other than just then when I see him visually then I knew who he was after the fact.

"THE COURT: … So the question is: Just assume that Detective Byrd becomes a witness in this matter, and let's assume he presents some pretty important testimony, is there anything about your relationship or your knowledge, or I should say acquaintance-ship with Detective Byrd that would cause you to give his testimony a leg up on any other witness?

"JUROR SEAT NUMBER THREE: None.

"THE COURT: Is there anything about your relationship that would cause you to have a notion that he's credible or would you be able to wait and hear and judge him by the standards, the same standards you would any other witness?

"JUROR SEAT NUMBER THREE: Same standards as anybody else. It's all what they put on here." The court briefly met with the attorneys, then the following took place:

"THE COURT: [¶] … [¶] After it was determined that you were a juror in this matter was there anything else said between you and Detective Byrd?

"JUROR SEAT NUMBER THREE: No, other than just yesterday morning just running into each other up here.

"THE COURT: All right. Any … conversation about the case or anything?

"JUROR SEAT NUMBER THREE: No. I was surprised to see him down in the

18

elevator."

After the juror was excused, Byrd was asked his recollection of what took place. This ensued:

"DETECTIVE BYRD: Basically Adam Mirelez was late for court. I went down to the first floor in order to look for him and I ran into, I didn't know his name at the time, but [Juror No. 3]. I saw him. He saw me. We instantly recognized each other and he gave me like a half hug. I noticed he was wearing a juror badge and I inquired asking him, Are you a juror? Or, You're a juror, where at? And he said, Department 72. I immediately recognized it was this courtroom and I told him at that time, That's my case that I'm on, and that he needed to immediately let the judge know that we know each other.

"And then I told him why I would also do the same and then he started just saying, Well, I didn't know. And I said, That's okay. You just need to let the judge know. And he said, then he told me, My name is [Juror No. 3] for when you talk to them, and that was it.

"THE COURT: All right. And the one thing I had sort of outlined … was that the relationship was for some type of sister or brother church.

"DETECTIVE BYRD: It's exactly that. I attend Lighthouse Christian Fellowship in Madera and he attends in Fresno and now and then along with a couple others we have men's retreats or some type of revival occasionally where groups come together and that's where I recognized him from, and that's the extent of it. It would just be, How are you doing? How are you doing? That type of thing. We're there for a church event and listen to pastors. That's the extent of it.

"THE COURT: Any questions?

"MR. SCHWAB [counsel for co-defendant Lopez]: Did he express any opinions about the case?

"DETECTIVE BYRD: No, not at all.

"MS. MARTINEZ [counsel for Petitioner]: I just have a question for the court, which is: Did [Juror No. 3] let the court know about this encounter? Because I think we only heard it from Detective Byrd.

"THE COURT: I don't know. Nobody spoke to me so I'm unable to answer your question. I'll make inquiries and I don't know if we can. [¶] … [¶] Because I have to figure out who the bailiff or clerk was. All right. So we'll make that determination with all things considered."

The court asked counsel to reserve any arguments for a later time. On August 26, after Mayberry, Perez, and Seamster had testified concerning their interviews with Byrd and the court had determined that the recording of Seamster's interview would be played for the jury so they could judge when [sic] Byrd essentially put words in her mouth, the court allowed counsel to make any requests or argument with respect to Juror No. 3. This followed:

"MR. SCHWAB: Very briefly. We would just object to the juror continued [sic] to be seated.

"THE COURT: You're making a motion to have him removed for cause? I want to be clear. [¶] … [¶]

"MR. SCHWAB: That is correct because of the nature of how he knows Mr. Byrd on a spiritual nature, on the spiritual retreats. He may hold somebody in higher esteem that he meets in that manner than he would just a police officer that's testifying on the stand. And we'll submit.

"MS. MARTINEZ: I would join …. [T]his wasn't, as often times happens, the juror will see a witness and maybe waive [sic] or something. I mean, he actually – I don't know which one came up to which one first, I think it was the juror hugged him and he said, God bless you. [¶] And so to me it was much more than that.… [¶] And then when we called the juror in he seemed very defensive.… The feeling I got is that he felt we were accusing him of something improper.…

"And again, because I think it's much more than just knowing a witness and the fact that he actually touched him, hugged him, bothers me. That's much more than a simple hello. And I would ask that he be removed for those reasons. I don't know that he could be fair and objective.

"And given that Detective Byrd is the lead detective, he's been sitting here through the trial, I mean, it's not a come-in-and-out witness, it's someone I'm sure they can see each other from where they both sit. And that's a concern to me. [¶] … [¶]

"MR. JENKINS [prosecutor]: [Juror No. 3] was pretty clear that he did not know Detective Byrd other than by sight, and he corroborated that with what the detective said, that they belonged to different branches of the same church. He did not know him and he was very clear that he would not give the detective's testimony any greater weight than any other witness. That's the same standard we use for every witness we put on the stand. And he seemed to be very forceful in his assertions that he would be fair.

"THE COURT: Well, what we have here is, I think we have very clear evidence. Detective Byrd's testimony to me was much clearer as to the level of relationship.… [¶] But it's clear … that there's a lack of relationship, … it would be difficult to even call it an acquaintanceship.

"And … Mr. Schwab's statements … don't cause me to doubt the juror, but … I had sort of the same concerns, but I don't know that it's the same speculations, … but if it's premised on the conclusion that one religious man would be more inclined to believe another religious man, and I don't know that without some affirmative commentary or statements by someone involved in that particular relationship or acquaintance, … it would be improper for me to… draw that conclusion. I think I would be treading on thin ice were I to do that.

"I'm simply going to … deny the motion at this point in time. I am cautious enough to continue to watch and to continue to be vigilant about any signs that I might see now or even in jury deliberations. I just don't feel that there's any motion.

"I simply think there's nothing there that I can use. But should there be something there or something added I would be inclined to go otherwise."

The trial court's refusal to discharge Juror No. 3 was subsequently presented as

one of the grounds for the defense motion for a new trial. The court rejected the claim of error, observing: "[W]hat we heard from the juror in question left no possible grounds to excuse him short of us thinking to ourselves without any basis. Well, he must … be a liar. And if his words … were to be given any credence at all there were no legal grounds to excuse him and there was nothing to suggest otherwise that he wasn't telling the truth when he said those words. There was just nothing inherent in the statement that made it seem unbelievable."

B. Analysis

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294; see, e.g., *Tanner v. United States* (1987) 483 U.S. 107, 126; *Ristaino v. Ross* (1976) 424 U.S. 589, 595, fn. 6.) " ' "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.) "Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' A trial court 'has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve.' [Citation.]" (*People v. Bennett* (2009) 45 Cal.4th 577, 621.)

While broad, however, the trial court's discretion is not unlimited. (*People v. Roberts* (1992) 2 Cal.4th 271, 325.) " ' "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence." ' [Citations.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 943; see also *People v. Maury* (2003) 30 Cal.4th 342, 434.)[n.25] These standards apply even where the asserted ground for discharge is juror misconduct. (*People v. Ledesma* (2006) 39 Cal.4th 641, 743; *People v. Miranda* (1987) 44 Cal.3d 57, 117, disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)

[n.25] The California Supreme Court has clarified that "a somewhat stronger showing than what is ordinarily implied by [the abuse-of-discretion] standard of review is required" where the appellate court is examining a trial court's decision to remove a juror. (*People v. Wilson* (2008) 44 Cal.4th 758, 821; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) "Thus, a juror's inability to perform as a juror must be shown as a 'demonstrable reality' [citation], which requires a 'stronger evidentiary showing than mere substantial evidence' [citation]." (*Wilson*, at p. 821.) Even so, the demonstrable reality standard does not involve the reweighing of evidence; rather, "[t]he inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*People v. Lomax* (2010) 49 Cal.4th 530, 589-590, fn. omitted.) We need not decide whether this more stringent standard of review also applies where, as here, the trial court has denied a defendant's challenge to a juror for bias. On the facts of this case, our analysis and conclusion are the same under either standard.

"[W]here a verdict is attacked for juror taint, the focus is on whether there is any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other

21

senses' [citation], which suggests a likelihood that one or more members of the jury were influenced by improper bias. [¶] When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct. [Citations.] A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]" (*In re Hamilton, supra,* 20 Cal.4th at pp. 294-295, fn. omitted.) Misconduct can be good cause for discharge of a juror under section 1089 (*People v. Ledesma, supra,* 39 Cal.4th at p. 743), even if it is "neutral" in the sense that it does not suggest bias toward either side (*People v. Daniels* (1991) 52 Cal.3d 815, 863-864), but removal is not necessarily the remedy required in every case (see *People v. Guzman* (1977) 66 Cal.App.3d 549, 559). In order for misconduct to constitute grounds to believe a juror will be unable to fulfill his or her functions as a juror, "such misconduct must be 'serious and willful.' [Citation.]" (*People v. Bowers* (2001) 87 Cal.App.4th 722, 729, quoting *People v. Daniels, supra,* at p. 864.)

"Misconduct by a juror raises a rebuttable presumption of prejudice. [Citation.] However, we will set aside a verdict only where there is a substantial likelihood of juror bias. [Citation.] We will find such bias if the misconduct is inherently and substantially likely to have influenced the jury. Alternatively, even if the misconduct is not inherently prejudicial, we will nonetheless find such bias if, after a review of the totality of the circumstances, a substantial likelihood of bias arose. [Citation.]" (*People v. Bennett, supra,* 45 Cal.4th at pp. 626-627.) Stated conversely, " '[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant.' [Citation.]" (*In re Lucas* (2004) 33 Cal.4th 682, 696.) "The presumption may be rebutted by proof that prejudice did not actually result. [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.)

The existence of prejudice is a mixed question of law and fact that is subject to our independent determination. (*People v. Bennett, supra,* 45 Cal.4th at p. 627.) Nevertheless, we accept the trial court's factual findings and credibility determinations where they are supported by substantial evidence. (*Ibid.*) Here, it is apparent the trial court found Byrd and Juror No. 3 credible. Although a trial court's assessment of a juror's state of mind or a juror's declaration of impartiality are not necessarily dispositive (see, e.g., *Holbrook v. Flynn* (1986) 475 U.S. 560, 570; *Irvin v. Dowd* (1961) 366 U.S. 717, 728; *People v. San Nicolas* (2004) 34 Cal.4th 614, 646; *People v. Williams* (1989) 48 Cal.3d 1112, 1129, neither are they irrelevant (see, e.g., *Smith v. Phillips* (1982) 455 U.S. 209, 217, fn. 7).

We turn first to the issue of inherent bias. This requires us to ask whether the event was so inherently prejudicial that by its very nature it was likely to have influenced the vote of any juror. (See *People v. Nesler* (1997) 16 Cal.4th 561, 580 (lead opn. of George, C.J.); cf. *People v. Danks* (2004) 32 Cal.4th 269, 305 [finding of inherently likely bias required only when extraneous information so prejudicial that erroneous introduction in trial would have warranted reversal].) The answer is no. Accordingly, "we now consider 'the nature of the misconduct and the surrounding circumstances' to determine whether it is substantially likely [any juror] was nevertheless actually biased as a result" of what occurred. (*Danks,* at p. 306.)

Bias in favor of or against a particular witness that renders a juror unable to fairly weigh that witness's testimony is grounds for that juror's discharge and replacement. (See

*People v. Barnwell, supra,* 41 Cal.4th at p. 1051.) Here, however, it would be speculative to assume Juror No. 3 was biased in favor of Byrd, or against defendants, when the record establishes merely that he and Byrd attended different branches of the same church and occasionally crossed paths at church retreats. (See *People v. Bennett, supra,* 45 Cal.4th at p. 621 [trial court did not abuse its discretion in declining to excuse juror where record did not support defendant's speculation juror was biased].) It is apparent neither knew the other's name, and that they had very little interaction at those events. It is also apparent neither recognized the other in the courtroom before they ran into each other in the elevator.

Lopez suggests the juror's testimony in this regard was disingenuous and that he "must have noticed" Byrd, "the designated investigating officer, seated next to the trial prosecutor," but this is speculation. We do not know the seating arrangements in the courtroom or whether Byrd's face was clearly visible from Juror No. 3's position; Byrd apparently did not notice Juror No. 3, and we would hope jurors were more focused on the witnesses testifying than on other trial participants. Byrd himself did not take the witness stand for the first time until August 20, the day after he and Juror No. 3 came into contact. Flemming insists the two "obviously" had a "close religious relationship" as shown by the fact Juror No. 3 hugged Byrd and said, "'Bless you, brother.'" However, we cannot consider the manner of greeting in isolation. In light of the testimony by Byrd and the juror that they barely knew each other, and the juror's emphatic insistence that he would judge Byrd's testimony by the same standards as any other witness and could be fair to both sides–testimony that was reasonably credited by the trial court (see *People v. Harris, supra,* 43 Cal.4th at pp. 1304-1305; *People v. Beeler* (1995) 9 Cal.4th 953, 975)–the record establishes nothing more than a standard greeting between members of the same religious denomination. The record does not suggest it was anything out of the ordinary or that it meant Juror No. 3 was likely to give Byrd's testimony more credence or weight than that of other witnesses.

Defendants argue that Juror No. 3's bias is apparent from his failure to report his contact with Byrd to the court, even though Byrd told him to do so. We believe defendants read too much into the record. Although it shows the court itself was not informed of the contact, it does not establish, with any certainty, that the juror never said anything to the bailiff or clerk.[n.26] In any event, Byrd was not in a position of authority over the juror. The court's preliminary instructions told jurors to inform the court or bailiff if they received information about the case from a source outside the trial. The record clearly shows Juror No. 3 and Byrd did not discuss the case itself. Moreover, it is apparent Juror No. 3 knew Byrd was going to report the incident and even gave Byrd his name for the purpose of doing so. It is also clear that the juror's defensiveness resulted from his awareness that he had violated the court's admonition not to speak to any of the witnesses, albeit inadvertently. Thus, we reject the notion that the juror demonstrated bias by intentionally concealing either his acquaintance with Byrd or the fact of their contact. (See *People v. San Nicolas, supra,* 34 Cal.4th at p. 644; cf. *In re Hitchings* (1993) 6 Cal.4th 97, 119-120; cf. *People v. Cochran* (1998) 62 Cal.App.4th 826, 830-831 [presumption of prejudice rebutted, and defendant not deprived of fair trial, where two jurors disclosed after trial began than they knew relatives of victim; acquaintances were minimal, and each juror stated she could be fair and impartial].)

[n.26] Even Byrd did not inform the court directly, but rather reported the contact to the prosecutor.

It is true that Juror No. 3 unintentionally violated the trial court's admonition not to speak to any of the witnesses involved in the trial. Discussing the case in violation of the court's admonition, or repeatedly and willfully violating the court's instructions, is serious misconduct that may constitute good cause for discharge. (*People v. Wilson,*

*supra,* 44 Cal.4th at pp. 834-835; *People v. Ledesma, supra,* 39 Cal.4th at p. 743; *People v. Daniels, supra,* 52 Cal.3d at pp. 863-864; *People v. Pierce* (1979) 24 Cal.3d 199, 205-207.) That is not what happened here, however. " '[W]hen the alleged misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant. [Citations.]' [Citations.]" (*In re Hamilton, supra,* 20 Cal.4th at pp. 305-306; *People v. Federico* (1981) 127 Cal.App.3d 20, 38.)

The record before us establishes that Juror No. 3's acquaintance with Byrd, together with the circumstances surrounding their contact and the revelation of that acquaintance to the court, "is not, judged objectively, 'inherently and substantially likely to have influenced the juror.' [Citation.] Nor does it objectively demonstrate a substantial likelihood, or even a reasonable possibility, of actual bias. [Citations.]" (*People v. Loker* (2008) 44 Cal.4th 691, 754-755; see *People v. Danks, supra,* 32 Cal.4th at p. 305 [reviewing court will not reverse unanimous verdict merely because there is some possibility juror was improperly influenced].) Accordingly, any presumption of prejudice stands rebutted, and the trial court did not abuse its discretion in refusing to discharge Juror No. 3. (See *People v. Holloway* (2004) 33 Cal.4th 96, 126; *In re Hamilton, supra,* 20 Cal.4th at p. 296; *People v. Zapien* (1993) 4 Cal.4th 929, 997.)

(See Resp't's Answer, Ex. A.)

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial  . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968).  The Court recognizes the "wide discretion owed to trial courts when it comes to jury-related issues." Mu'Min v. Virginia, 500 U.S. 415, 427-428 (1991).  A state trial court's finding of impartiality is "presumptively correct under 28 U.S.C. § 2254[(e)(1)]." Smith v. Phillips, 455 U.S. 209, 218 (1982).  In this case, the trial judge, after questioning and observing both the officer and the juror, determined there was no evidence of any bias or misconduct.  The court noted that the officer and the juror were very candid and sincere in their accounts of their chance meeting outside the courtroom.  The court noted that the two individuals scarcely knew each other, and it would be difficult to even call their relationship an acquaintanceship.  The juror stated he would be completely impartial, and the court found no reason to doubt him.  The court was in the best position to judge the sincerity of the juror's claim of impartiality.  Under AEDPA, a habeas petitioner bears the heavy burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U .S.C. § 2254(e)(1).  Here, Petitioner has not presented any evidence to meet this burden. See United States v. Quintero–Barraza, 78 F.3d 1344, 1350 (9th Cir.1996). The claim should be rejected.

1        B.  Admission of Surveillance Video and Photographs

2        Petitioner next claims the trial court erred in admitting evidence in the form of a

3   surveillance video and photographs acquired from that video.

4        This claim was also presented on direct appeal to the Fifth DCA where it was denied in a

5   reasoned decision.  (See Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the

6   California Supreme Court where it was summarily denied.  (See Lodged Doc. No. 6.)  Therefore,

7   the Court must "look through" the decision of the California Supreme Court to the reasoned

8   decision of the appellate court.  Ylst, 501 U.S. at 804-05 & n. 3.  In rejecting the claim, the Fifth

9   DCA stated:

10        ADMISSION OF SURVEILLANCE VIDEO AND PHOTOGRAPHS

11        Flemming contends the trial court erred by admitting into evidence a surveillance
     video from the Liquor King, and still photographs made from that video, because they
12   were not adequately authenticated. Lopez joins in the argument. We conclude any error
     was harmless.
13
     A. Background
14
        Detective Miramontes testified that at some point, he contacted Liquor King to
15   determine if there was a videotape of the events of Easter Sunday 2008. The clerk who
     was working at the store at the time said he did not know how to access the system to
16   make a copy, but he would call someone who knew how. Miramontes then asked the
     person for a copy of the videotape of the surveillance inside the store or whatever he had.
17   This individual indicated at some point that he was the person who knew how to access the
     system. Miramontes recalled that he was either the store's owner or its manager, but
18   did not document the person's name. Miramontes told the person what he needed, the
     person was given access to the store, and about 30 minutes later the person told
19   Miramontes it was ready and gave him the videotape. Miramontes did not know if the
     person made a copy of the tape or handed over the original, and did not do anything to
20   make sure it had not been altered in any way. He turned the tape over to Byrd.

21        Byrd testified that the videotape was represented to him as showing the interior of
     the Liquor King on the night of the shooting. Byrd had been inside the store. With respect
22   to the date and time depicted on the tape, Byrd explained that whenever a purchase was
     rung up on the register, the register tape of the transaction, showing what was purchased
23   and the date and time, was recorded on the video itself. The videotape, which he viewed,
     corresponded to the date of the shooting. With respect to the time, he somewhat
24   confusingly stated, "And as far as the time, specifically when I saw what matched, what
     was being told of me it had the time of 23:24, which is 11:24 p.m."
25
        Byrd explained that the police department's robbery unit had a machine for
26   creating still photographs from videos. Byrd identified People's exhibits 85 and 86 as
     photographs he obtained from the surveillance video, and People's exhibits 87 and 88 as
27   close-ups from the photographs.

28        At trial, no one directly identified Flemming as the shooter. Shown People's

25

exhibit 87, which depicted an African-American male in a white sweater or similar garment, Mirelez testified that the white sweater was familiar to him, and that the person who pulled the gun had a sweater like that. When Janell Mayberry was shown the photograph, he said the person in it looked like Flemming, although he could not remember if Flemming was wearing that sweater on the night of the shooting. Shown People's exhibit 85 by the prosecutor, Kevin Tatum identified himself and Perez, although he could not identify the individual in white. He testified that the photograph showed the interior of the Liquor King, and that what it showed him wearing was consistent with what he wore on Easter Sunday. Shown People's exhibit 87, Tatum testified he recognized the same individual in white, and the like. It was Flemming, wearing a white sweater. Asked if that was how Flemming appeared on Easter Sunday 2008, Tatum stated he did not remember. Under cross-examination by Flemming's attorney, Tatum confirmed that he definitely recognized Flemming in the photograph, but not what he was wearing.

Flemming subsequently objected to the playing of the surveillance videotape on the ground that a proper foundation had not been laid. Lopez joined in the objection. The court clarified that defendants were concerned with the mode of preparation, the circumstances by which it came into being, and the like. The prosecutor argued that the tape was self-authenticating; it showed the interior of the Liquor King and the individuals present, and one of the witnesses identified himself and said he was there. In addition, the tape showed the date and time the events were occurring. Further, Miramontes went to an employee and said he wanted the video surveillance, the employee said he would have to contact the right person, that person came and gave Miramontes the tape, and the tape corresponded to what it was supposed to be. Counsel for Flemming pointed out that dates could be changed. Counsel for Lopez argued that Miramontes did not do anything to find out if the tape was authentic or had been altered; hence, the tape was not sufficiently authenticated.

The court ruled that the tape did not self-authenticate, as there was nothing to show the time and date stamps were accurate or set correctly on the date in question. It then stated:

"On the other hand, there is … slight authentication through the testimony of Miramontes[,] through the circumstances that he testified to[,] through the testimony of the several witnesses that identified that as being a photograph, People's 85, I believe, of the night in question. And … at this point in time it is not admissible.

"Once the testimony of Detective Byrd comes out that the pictures came from the tape and … the tape accurately represents the store and whatnot. I'm going to find that there is … the minimum basis for this type of evidence, the standard for admissibility is very low. And … the lack of proof goes to the weight rather than the admissibility of the evidence."[n.17]

[n.17] Although the finality of the court's ruling is unclear in light of the testimony Byrd had already given, the court subsequently stated it had reserved ruling on the tape until after Byrd testified further concerning foundation. It granted defendants a continuing objection to the evidence.

Byrd subsequently testified that he received the videocassette from Miramontes at the scene. Byrd had asked Miramontes about surveillance videos from the Liquor King and other surveillance that might be around, which was how the tape came to be obtained. Byrd did not observe the tape being made or copied, so did not know if any alterations were made. He did not personally speak with anyone at Liquor King about the tape. He

further testified, however, that he personally had been inside the Liquor King, and the cameras could be spotted inside the store. He had viewed the videotape on more than one occasion, and recognized it as depicting the Liquor King's interior. Byrd explained that Liquor King had four cameras in various areas around the store (one over the door, one behind the register, one in the corner facing the door on the opposite end wall, and one facing north and covering the office door at the far end of the store), and the system flashed from one camera to another. The tape ran at a high rate of speed, and so he had to pause it in order to advance one frame or camera at a time. Byrd further explained that the camera behind the register showed the receipt of any purchase being made, including the items being bought, the cost, and the date and time. Byrd's notes said the time stamped on the video was one hour ahead. He believed Miramontes was the source of that information, based on which Byrd believed the time shown on the video was not correct.

Byrd testified that he spoke to Susanna Bosquez, who was the mother of Jimenez's child. After interviewing her on the night of events and then viewing the video, he recognized her in the video. This gave him a good way of knowing he was at the appropriate time aside from what appeared on the receipts. Insofar as Byrd knew, nobody gave specific times when they were in the store, but the date and time depicted on the video referred to the evening of the shooting. Based on the 911 call, the shooting occurred at 11:41 p.m., which was 23:41 in military time. The time at which Tatum identified himself and the others as being present was 23:24, roughly 19 minutes before the shooting was reported, if based on the time stamp on the video.

Asked if he felt with certainty that he knew the videotape accurately depicted the time of the incident, Byrd responded, "Based on the statements I received from people telling me when they were interviewed, when they were in the store, and that they entered the store I believe it to be fairly accurate." However, he did nothing to verify the authenticity of the tape or time shown with anyone responsible for the tape.

Byrd explained that he created the still photographs using a special VCR system possessed by the police department's robbery unit. The system allows detectives to freeze a surveillance video at the desired location and then copy a photograph of that spot. When Byrd interviewed Kevin Tatum on April 15, Tatum admitted being in the Liquor King on Easter Sunday 2008. Shown People's exhibit 85, Tatum identified himself in the photograph. Tatum also identified others in the photograph, including Lopez and Perez, and said they were in the store at the same time he was. He also identified Flemming, although from a different photograph. (People's exhibit 87). Tatum mentioned that Flemming was wearing a white jacket.

The prosecutor subsequently moved the videotape and the photographs into evidence. Flemming objected to the tape, particularly because the time and date stamps were known to be inaccurate. Lopez joined, and also argued that there had not been a proper foundation laid not so much as to the video's authenticity, but as to its reliability. The prosecutor responded that the foundation had been laid for the tape being what it purported to be: The individuals who were asked for the surveillance tape had the apparent ability to provide it in response to the request; Byrd had viewed the tape and it corresponded to what he viewed at the scene and what witnesses told him; and Tatum identified individuals, including himself, on the tape.

The court ruled the video was admissible.[n.18] Leaving aside the time and date stamps, it found that the testimonies of Miramontes, Byrd, and the other witnesses combined to establish that the tape depicted the Liquor King at a point in time during the events on the evening at issue. With respect to the accuracy of the timing of the tape, the court found that the witnesses' testimony provided a rough but inaccurate timeline, and that no evidence had been presented to the jury to establish that the time and date stamps

were what they purported to be. The court was not persuaded the time and date stamps were accurate; no testimony had been offered on that point, and counsel were free to argue the matter to the jury. In the court's view, however, there was sufficient foundation to admit the tape, as the witnesses adequately established that the pictures on the tape "were a result of their adventures on that night and the late evening hours sometime before the shooting." Because the photographs were, according to Byrd's testimony, accurate copies that he made from the tape, and the tape was admitted, the photographs were also admitted.

[n.18] Because the videotape (People's exhibit 97) was damaged during trial, a DVD copy was substituted (People's exhibit 100).

Portions of the video were subsequently shown to the jury, with Byrd identifying various persons, including the individual Tatum said was Flemming. At one point, counsel for Flemming asked what time the portion started. Byrd responded that the video was stamped 23:23, which was 11:23 p.m., but that it was either 10:23 p.m. or 11:23 p.m. On another portion of the video, a receipt was shown. It bore the date March 23, 2008, and the time of 23:23. When counsel for Flemming asked Byrd, "And you don't know, sitting there, that that's accurate?" the court interjected, "Correct. We've now established that."

During her summation, counsel for Flemming stated she did not contest the fact that Flemming was at the Liquor King sometime on the night of the shooting, but she argued there were several African-American men there, Flemming was not the only one in a white shirt, and the prosecutor failed to prove he was the shooter. Flemming's attorney also pointed out the problems with the tape, including that the police did not have the name of the person who made it and did not know if it was altered, and the fact the time stamp was an hour off. The prosecutor responded by listing the various witnesses who placed Flemming at the Liquor King. He also argued that assuming the tape was an hour off, nothing changed: Flemming and his friends were still in the parking lot, and Flemming was still wearing a white sweater.

Defendants subsequently moved for a new trial, in part based on the admission of the videotape and photographs. The motion was denied.

B. Analysis

Only relevant evidence is admissible. (Evid. Code, § 350; *People v. Lucas* (1995) 12 Cal.4th 415, 466.) A writing is relevant only if it is shown to be authentic, since, without proof of authenticity, it has no tendency in reason to prove or disprove a fact at issue in the case. (*People v. Beckley* (2010) 185 Cal.App.4th 509, 518; *Poland v. Department of Motor Vehicles* (1995) 34 Cal.App.4th 1128, 1135; see Evid. Code, § 210.)[n.19] "'[I]n some legal systems it is assumed that documents are what they purport to be, unless shown to be otherwise. With us it is the other way around.'" (*McAllister v. George* (1977) 73 Cal.App.3d 258, 262.) Accordingly, authentication of a writing is required before either the writing or secondary evidence of its content may be received into evidence. (Evid. Code, § 1401.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (*Id.*, § 1400.) "A video recording is authenticated by testimony or other evidence 'that it accurately depicts what it purports to show.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 747.) "Circumstantial evidence, content and location are all valid means of authentication [citations]." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.)

[n.19] The video recording and photographs at issue here each constitute a "writing" under the Evidence Code. (Evid. Code, § 250; *People v. Rich* (1988) 45 Cal.3d 1036, 1086, fn. 12; *People v. Beckley, supra,* 185 Cal.App.4th at p. 514.)

The authenticity of a writing is a preliminary fact that must be proven before the proffered evidence is admissible. (Evid. Code, § 403, subd. (a)(3); *People v. Phillips* (1985) 41 Cal.3d 29, 76 (plur. opn. of Reynoso, J.).) "When, as here, the relevance of proffered evidence depends upon the existence of a foundational fact, the proffered evidence is inadmissible unless the trial court determines it 'is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence.' [Citations.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; Evid. Code, § 403, subd. (a)(1).) "In other words … there [must] be sufficient evidence to enable a reasonable jury to conclude that it is more probable that the fact exists than that it does not. [Citations.]" (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61.) "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' [Citations.]" (*People v. Lucas, supra,* 12 Cal.4th at p. 466.) "As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the [writing's] weight as evidence, not its admissibility. [Citations.]" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321 & cases cited.) A trial court's ruling on the sufficiency of the foundational evidence is reviewed for abuse of discretion (*People v. Tafoya, supra,* 42 Cal.4th at p. 165; *People v. Lucas, supra,* 12 Cal.4th at p. 466), keeping in mind, of course, that the court has no discretion to admit irrelevant evidence (Evid. Code, § 350; *People v. Poggi* (1988) 45 Cal.3d 306, 323).

"The general rule is that photographs are admissible when it is shown that they are correct reproductions of what they purport to show. This is usually shown by the testimony of the one who took the picture. However, this is not necessary and it is well settled that the showing may be made by the testimony of anyone who knows that the picture correctly depicts what it purports to represent." (*People v. Doggett* (1948) 83 Cal.App.2d 405, 409; see also *People v. Bowley* (1963) 59 Cal.2d 855, 859 [testimony of person present when film made that film accurately depicts what it purports to show is legally sufficient foundation for admission].) Indeed, videotapes or photographs from surveillance cameras at commercial establishments are typically admitted into evidence despite the fact the photographer or videographer does not testify. Commonly, "[i]n those situations, a person testifies to being in the building and recounts the events depicted in the photographs. Courts have consistently held that such testimony establishes a sufficient foundation if the videotape is a ' "reasonable representation of that which it is alleged to portray." ' [Citations.]" (*People v. Khaled* (2010) 186 Cal.App.4th Supp. 1, 5.)

Here, Byrd's testimony concerning the Liquor King's interior and camera placement, combined with the statements made to him by, and/or testimony of, Bosquez, Tatum, and Perez concerning their presence in the store and who else was there, established a sufficient foundation that the videotape accurately depicted what it purported to show, namely the interior of the Liquor King on the night of the shooting. This is so despite the fact police should take care to ensure the authenticity of any photographic or video evidence they collect can be established, something that can be critical to prevent the admission of manipulated images, especially in light of the relative ease with which digital images today can be altered. (See *People v. Beckley, supra,* 185 Cal.App.4th at pp. 515-516.) Since Byrd himself made the photographs from the videotape, they were also sufficiently authenticated.

How close to the time of the shooting the videotape was made and the accuracy of the identifications of defendants were questions for the jury to decide. As the California Supreme Court has explained, "The trial court has the preliminary, but not the final,

authority to determine the question of the existence of the preliminary fact. Unlike in other situations (see, e.g., *People v. Alcala* (1992) 4 Cal.4th 742, 787 [preliminary fact of competence of witness is question for court under Evidence Code sections 402 and 405]), under Evidence Code section 403, '[t]he preliminary fact questions listed in subdivision (a) [of Evidence Code section 403] … are not finally decided by the judge because they have been traditionally regarded as jury questions. The questions involve the credibility of testimony or the probative value of evidence that is admitted on the ultimate issues. It is the jury's function to determine the effect and value of the evidence addressed to it.… [T]he judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. The "question of admissibility … merges imperceptibly into the weight of the evidence, if admitted." ' [Citation.]" (*People v. Lucas, supra,* 12 Cal.4th at pp. 466-467; see also *People v. Avery* (1950) 35 Cal.2d 487, 492 [uncertainty of witness's recollection or lack of positiveness about identity of persons involved went to weight, not competency, of evidence].) The possible problems with the time shown on the video were fully placed before jurors, who could also assess the quality of the video and photographs and decide whether they were clear enough to permit accurate identifications.

Finally, even assuming error, it is not reasonably probable defendants would have obtained a more favorable result had the video and photographs not been admitted into evidence. (See *People v. Lucas, supra,* 12 Cal.4th at p. 468 [applying test of *People v. Watson* (1956) 46 Cal.2d 818, 836]; *People v. Beckley, supra,* 185 Cal.App.4th at p. 517 [same].)[n.20] Byrd's testimony concerning what the witnesses (particularly Tatum and Perez) told him about who was present on the night of the shooting and what Flemming was wearing, was admissible independent of the video and photographs. Given the poor quality of the video and photographs (which we have viewed), jurors' actually seeing those items added little or nothing, and certainly did not render the trial fundamentally unfair. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1142, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Chatman* (2006) 38 Cal.4th 344, 371; cf. *People v. Jimenez, supra,* 165 Cal.App.4th at pp. 81-82.)

[n.20] Defendants claim that prejudice from the evidence's admission "must be assessed by the standard for federal constitutional error, namely whether the error was harmless beyond a reasonable doubt. [Citation.] We reject [defendants'] attempt 'to inflate garden-variety evidentiary questions into constitutional ones.' [Citation.] The proper standard for review of the assumed evidentiary error here is that for state law error under [*Watson*](whether 'it is reasonably probable that a result more favorable to [defendants] would have been reached in the absence of the error')." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.)

In *People v. Jimenez* (2008) 165 Cal.App.4th 75, 81-82, we applied the harmless-beyond-a-reasonable-doubt test, finding the erroneous admission of DNA evidence with an inadequate chain of custody to be so prejudicial as to have rendered the defendant's trial fundamentally unfair and, thus, a violation of due process. The nature of the erroneously admitted evidence is much different in the present case, however; hence, *Jimenez* is distinguishable.

(See Resp't's Answer, Ex. A.)

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 68 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985); Henry v. Kernan, 177

1   F.3d 1152, 1159 (9th Cir.1999) (admission of evidence in a state trial is not subject to federal

2   habeas review unless it violates a specific constitutional right).  However, there can be habeas

3   relief for the admission of prejudicial evidence if the admission was fundamentally unfair and

4   resulted in a denial of due process. Estelle, 502 U.S. at 72-73; Pulley v. Harris, 465 U.S. 37, 41

5   (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180,

6   1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th

7   Cir.1990).  The failure to comply with state rules of evidence alone is neither a necessary nor a

8   sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de

9   Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).

10          Nevertheless, with respect to the admission of irrelevant or overtly prejudicial evidence,

11  the Supreme Court has not squarely decided when the Constitution would overrule a

12  discretionary ruling by a state court.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009)

13  (Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

14  prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

15  writ").  Absent such "clearly established Federal law," this Court cannot conclude that the state

16  court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77.  The claim should be

17  denied.

18          C.  Prosecutorial Misconduct and Ineffective Assistance of Counsel

19          In his final claim for relief, Petitioner alleges the prosecutor committed misconduct

20  during opening statement when he used certain slides and photographs during a presentation.

21  Petitioner contends these slides and photographs were unduly prejudicial and constituted a

22  reprehensible method of inciting and persuading the jury.  He further claims defense counsel was

23  ineffective in failing to timely object.

24          Petitioner also presented this claim on direct appeal to the Fifth DCA, and it was rejected

25  in a reasoned decision.  (See Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the

26  California Supreme Court where it was summarily denied.  (See Lodged Doc. No. 6.)  The Court

27  must "look through" the decision of the California Supreme Court to the reasoned decision of the

28  appellate court.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA denied the claim as follows:

1    PROSECUTORIAL MISCONDUCT

2    A. Background

3            During his opening summation, the prosecutor displayed a lengthy PowerPoint
     presentation to the jury.[n.39] In addition to slides displaying applicable legal principles
4    and portions of the evidence adduced at trial, the presentation included a slide reading, "A
     BLACK MALE MURDERED FIDEL JIMINEZ!" and "WHO IS THIS BLACK MALE?
5    HOW DO WE FIND OUT?" Between the two statements were a large question mark, a
     close-up photograph of a bullet hole in Jimenez's vehicle, and a close-up photograph
6    taken at autopsy of the right side of Jimenez's head and neck, in which the healing
     gunshot wound was visible. Amid further slides displaying witness statements and other
7    evidence, the prosecutor included the same slide, but now with the statements, "A
     BLACK MALE MURDERED FIDEL JIMINEZ!" and "WHO IS THIS BLACK
8    MALE?" and with the question mark turned into a jigsaw puzzle with pieces beginning to
     be filled in so that a photograph of a person gradually emerged. In slide 65, the puzzle
9    was completed; it was a photograph of Flemming. The slide stated, "A BLACK MALE
     MURDERED FIDEL JIMINEZ!" and "HIS NAME IS COURTNEY FLEMMING."
10   Flemming's photograph, the bullet hole, and the autopsy photograph were displayed again
     on slide 67, along with, "COURTNEY FLEMMING MURDERED FIDEL JIMINEZ!"
11   and "We know this based on the Statements 'and lies' of his own friends." After further
     slides containing evidence and legal principles, the prosecutor presented a slide
12   containing photographs of Flemming, the wound to Jimenez's head, and the gun found at
     Lopez's residence, with statements of what the prosecutor needed to prove, Flemming's
13   alleged actions, and the purported proof. Slide 74 bore the statement, "COURTNEY
     FLEMMING MURDERED FIDEL JIMINEZ!" and juxtaposed a photograph of
14   Flemming, a Liquor King surveillance photograph of an individual that purportedly was
     Flemming, a photograph of the gun found in Lopez's room and the shirt in which it was
15   wrapped, and a close-up color autopsy photograph of the healing wound to Jimenez's
     head. Slide 78 substituted a photograph of Lopez for the surveillance photograph and
16   stated, "COURTNEY FLEMMING MURDERED FIDEL JIMINEZ!" and "LUCIANO
     LOPEZ IS EQUALLY GUILTY." Additional slides set out further law and evidence, and
17   the presentation concluded with a close-up photograph of the gun under the statement,
     "Courtney Flemming and Luciano Lopez Guilty of the senseless MURDER of FIDEL
18   JIMENZ [sic]."

19           [n.39] A copy of the presentation has been placed on CD and made part of the
             record on appeal. We have viewed the exhibit. In the descriptions that follow, we
20           quote verbatim from the various slides. We recognize that some of the names are
             not spelled the same as in the trial transcript.

21
             Court recessed for the day at the conclusion of the prosecutor's opening argument.
22   The next morning, Flemming's attorney objected to the PowerPoint presentation under
     Evidence Code section 352. Counsel stated: "I'm objecting to the scenes up there. My
23   client, it was really reminiscent to me of the whole OJ thing. My client is on the screen
     next to a black revolver. The only Black guy. And then the autopsy photo of Fidel
24   Jiminez, it's intended to insight [sic], inflame the jury and I'm objecting under 352."
     Lopez's attorney also objected, under Evidence Code section 352, to use of the
25   photographs, arguing, "What they do is use booking paragraphs [sic] or nefarious
     photographs used to inflame the passions of the jury." When the court asked whose
26   booking photographs were used, counsel for Lopez responded that Lopez's booking
     photograph was used and he believed also Flemming's, and that the manner in which they
27   were used was inflammatory.

28           After the prosecutor stated that the photographs used of the various witnesses

                                          32

were from the Department of Motor Vehicles, the court expressed some concern that they were not in evidence, but understood the point was to allow the jury to associate testimony with a face, and so found their use not prejudicial. The court rejected any notion that a photograph of a defendant placed against a weapon was any more prejudicial than the typical closing argument of a prosecutor. It concluded: "So the only slight concerns I have are using matters that are not in evidence. And at this point in time it's too late to object and if at some appropriate time you want to make a motion for new trial, I'll tell you now my inclination is to deny it."

Flemming raised the issue again in his new trial motion, in which Lopez joined. Flemming pointed specifically to slide 74 (the juxtaposed photographs of Flemming, the video surveillance, the gun, and Jimenez's head), and asserted that use of the slide, the purpose of which was to inflame the jury, constituted a reprehensible method of persuading the jury. At the hearing on the motion, Flemming's attorney argued:

"I thought the use, especially on Power Point and it's on, I don't know, a ten foot wall and it's amplified and it … reminded me of the O.J. Simpson cases where I thought it was used to inflame the jury. I thought it was somewhat racist. Actually, I thought it was racist putting my client's face in a photo that was never admitted before the jury. It just looked very sinister.

"Next to a revolver. A revolver that … it was never established that the bullet in Mr. Jimenez came from that revolver yet the revolver is there. "My client's black face in front of a jury. It was very menacing and the fact that [the prosecutor] propped [sic] the photo of Mr. Jimenez, just the ear with …the bullet wound entry, I think all was designed to prejudice the jury, to inflame the jury. I found it highly offensive. I hope that everybody else did too.

"And that was my objection. I just thought that it was reprehensible how he used the Power Point presentation for that purpose."

The prosecutor responded that nothing about Flemming's photograph suggested it was a booking photograph, and Flemming looked very similar to the way he looked in court. The prosecutor asserted that using the photograph was no different than using Flemming's name, and noted the jury had seen Flemming throughout the trial. The prosecutor reasoned that for purposes of argument, the photograph did not need to be in evidence because it was just pointing out the individual about whom the prosecutor was talking. As for the slide in its entirety, the prosecutor argued that it summarized the case against Flemming, did not contain any overly gruesome images, and was not designed to be racist or inflame the jury, but rather to argue that Flemming was the person who killed Jimenez.

In denying the motion, the court found it improper to show the jury a photograph that had not been received into evidence, but concluded the use of "this rather toned-down piece of unadmitted evidence" was insufficient to warrant a new trial. The court further found it "inconceivable … to think that a picture of a Black man without more is in any way racist." The court found the slide as a whole did not "represent anything more than what could have been said orally," and that the photographs were put together in an attempt to be persuasive.

B. Analysis

Flemming now says the prosecutor committed intentional, prejudicial misconduct by using slide 74 in his closing argument. This is so, Flemming asserts, because use of the juxtaposed photographs was an improper appeal to the passions and prejudices of the

jury. Lopez joins in the claim.

The applicable standards are settled. "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights–such as a comment upon the defendant's invocation of the right to remain silent–but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) Prosecutorial misconduct does not require a showing of bad faith or wrongful intent. (*People v. Hoyos* (2007) 41 Cal.4th 872, 924, fn. 36, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 624-625; *People v. Hill* (1998) 17 Cal.4th 800, 822.) Rather, "'when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 260.)

To preserve a claim of prosecutorial misconduct for appellate review, "a defendant must contemporaneously object and seek a jury admonition. [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.) Arguments made in the context of a motion for new trial, or at a time when it is too late for the trial court, through admonition of the jury, to correct any error or mitigate any prejudice, do not constitute a timely objection. (*People v. Williams* (1997) 16 Cal.4th 153, 254.)

Defendants recognize their trial attorneys failed to object in a timely manner to the asserted misconduct they now attempt to raise. Anticipating we will therefore find their claims forfeited, they assert their attorneys' inaction violated their constitutional right to the effective assistance of counsel. Although they are entitled to make such a claim (*People v. Lopez* (2008) 42 Cal.4th 960, 966), the California Supreme Court has cautioned "that a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel. [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14.) In any event, since either the prosecutor did not commit misconduct or any misconduct was harmless even absent an admonition to the jury, defendants' claim fails, whether addressed as ineffectiveness of counsel or on the merits. (See *ibid.*; *People v. Young* (2005) 34 Cal.4th 1149, 1188.)

"'[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 463.) It is for the jury to decide whether the inferences the prosecutor draws from the evidence are reasonable. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1146.) A prosecutor may not, however, appeal to the sympathy or passions of the jury at the guilt phase of a trial. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250.) "'It is … improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' [Citations.]" (*People v. Redd* (2010) 48 Cal.4th 691, 742-743.)

We see no improper appeal to passion or prejudice here. The prosecutor's juxtaposition of the four photos was simply a dramatic, visual means by which to illustrate his argument that the evidence established Flemming shot and killed Jimenez.

Contrary to defendants' oft-repeated assertion, the photographs themselves were not prejudicial, either considered alone or in combination. Three of the four photographs were in evidence, and the autopsy photo – the only one with any potential to generate an emotional reaction – did not depict Jimenez's body cut open, but simply showed a healing wound that was not the least bit gory-looking.[n.40] As the photographs were in evidence, "[t]he prosecutor cannot be faulted for misconduct because he referred to them, nor was he required to discuss his view of the case in clinical or detached detail. [Citations.]" (*People v. Panah, supra,* 35 Cal.4th at p. 463.)

> [n.40] To the extent there was something on Jimenez's neck that might have been mistaken for blood, Dr. Chambliss, who performed the autopsy, explained it was iodine or betadine and was related to the medical therapy Jimenez received while in the hospital.

The photographs of Flemming (and of Lopez in one of the other slides) were not in evidence. Assuming the prosecutor should not have used them in his argument (cf. *People v. Collins* (2010) 49 Cal.4th 175, 209 [prosecutor may not assume or state facts not in evidence]), any misconduct was manifestly harmless under any standard. Nothing in either photograph suggested they were taken at the time defendants were booked and, insofar as the record shows, defendants looked virtually the same in the photographs as they did in court, with the exception, obviously, that their clothing was different. In addition, counsel for Flemming responded forcefully and effectively to the prosecutor's use of the images in her closing argument. Moreover, the trial court instructed jurors not to let "bias, sympathy, prejudice or public opinion" influence their decision, that they were to decide the facts based only on the evidence, and that the attorneys' remarks during closing arguments were not evidence. We presume the jury followed these instructions. (*People v. Martinez, supra,* 47 Cal.4th at p. 957.)[n.41]

> [n.41] In conjunction with several issues briefed by Lopez, defendants contend the trial errors cumulatively denied them their rights to due process and a fundamentally fair trial. Lopez's briefing in this regard violates California Rules of Court, rule 8.204(a)(1)(B), which requires that each brief state each point under a separate heading or subheading, by simply adding a paragraph asserting cumulative prejudice where purportedly applicable. Defendants also assert, again by way of Lopez's brief, that several alleged errors violated the federal constitutional guarantee of substantive due process. The briefing on this issue, which again is not set out under a separate heading or subheading, simply consists of Lopez's bald assertion, followed by the citations of several cases. There is no discussion of why substantive due process has allegedly been violated, or how the cases cited are applicable to defendant's case. Simply stating a claim does not make it so.

> In light of the foregoing, we decline to reach either claim. (See *People v. Wharton* (1991) 53 Cal.3d 522, 563.) Were we to do so, however, we would reject both. (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 468.)

(See Resp't's Answer, Ex. A.)

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).   To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the

1  defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765 (1987), *quoting* <u>United</u>

2  <u>States v. Bagley</u>, 473 U.S. 667 (1985).  Any claim of prosecutorial misconduct must be reviewed

3  within the context of the entire trial.  <u>Id</u>. at 765-66; <u>United States v. Weitzenhoff</u>, 35 F.3d 1275,

4  1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due process analysis

5  in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

6  prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the

7  prosecutor but avoidance of an unfair trial to the accused."  <u>Smith v. Phillips</u>, 455 U.S. 209, 219

8  (1982). "Improper argument does not, per se, violate a defendant's constitutional rights."

9  <u>Thompson v. Borg</u>, 74 F.3d 1571, 1576 (9th Cir. 1996), *quoting* <u>Jeffries v. Blodgett</u>, 5 F.3d 1180,

10  1191 (9th Cir.1993). If prosecutorial misconduct is established, and it was constitutional error,

11  the error must be evaluated pursuant to the harmless error test set forth in <u>Brecht v. Abrahamson</u>,

12  507 U.S. 619 (1993). <u>See</u> <u>Thompson</u>, 74 F.3d at 1577 ("Only if the argument were constitutional

13  error would we have to decide whether the constitutional error was harmless.")

14       In this case, the prosecutor utilized six photographs which are the subject of this claim.

15  Four of the six photographs were in evidence; thus, there can be no misconduct as to these

16  photographs.  As to the remaining two photographs (one of Petitioner and the other of co-

17  defendant Lopez), Petitioner fails to demonstrate misconduct by the prosecutor.  As noted by

18  Respondent, the photographs could not have been prejudicial.  They depicted Petitioner and his

19  co-defendant in virtually the same manner as they appeared in court, with the exception of their

20  clothing.  There was nothing inherently prejudicial about the photographs, such as might occur

21  from a booking photograph.  Also, Petitioner does not point to any Supreme Court authority

22  which would forbid such evidence.  As previously noted with respect to the admission of

23  irrelevant or overtly prejudicial evidence, the Supreme Court has not squarely decided when the

24  Constitution would overrule a discretionary ruling by a state court.  <u>Holley</u>, 568 F.3d at 1101.

25  Therefore, Petitioner fails to demonstrate that the state court rejection was contrary to, or an

26  unreasonable application of, clearly established Supreme Court precedent.

27       Likewise, Petitioner's claim of ineffective assistance of counsel must fail.  It follows that

28  if the prosecutor committed no misconduct, then any objection by defense counsel likely would

have been denied.  Counsel cannot be faulted for failing to make a frivolous motion.  See Rupe v. Wood, 93 F.3d 1434, 1444-45 (9th Cir.1996) ("[T]he failure to take a futile action can never be deficient performance." ), *cert. denied*, 519 U.S. 1142 (1997); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir.) (counsel is not obligated to raise frivolous motions, and failure to do so cannot constitute ineffective assistance of counsel), *cert. denied*, 513 U.S. 1001 (1994).  Certainly, in light of the above, the state court's conclusion that a rational attorney could have declined to raise an objection was not unreasonable.  Therefore, the claim should be rejected.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **August 24, 2012**          _____ **/s/ Gary S. Austin** _____
                                                        UNITED STATES MAGISTRATE JUDGE

37